FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF GEORGIA**
**AUGUSTA DIVISION**

2003 JUL 23  PM 3: 30

CLERK _____
SO. DIST. OF GA.

```
HOOTERS OF AUGUSTA, INC.;      *
and SAM NICHOLSON,             *
and all other persons          *
or entities similarly          *
situated,                      *
                               *
          Plaintiffs,          *
                               *
     v.                        *      CV102-061
                               *
AMERICAN GLOBAL INSURANCE      *
COMPANY; and ZURICH            *
INSURANCE COMPANY,             *
                               *
          Defendants.          *
```

---

**O R D E R**

---

Presently before the Court are three motions for summary judgment: (1) a motion by Sam Nicholson ("Nicholson") (Doc. No. 44); (2) a motion by Hooters of Augusta, Inc. ("Hooters") (Doc. No. 54); and (3) a joint motion by American General Insurance Company ("AGIC") and Zurich Insurance Company ("Zurich"). (Doc. No. 58.) For reasons stated more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** Nicholson's and Hooters' motions for summary judgment. Further, the Court **GRANTS IN PART** and **DENIES IN PART** AGIC and Zurich's (collectively "the Insurers") joint motion for summary judgment.

DHB (36)

ccc: *DNB*
*BM.*

*77.*

AO 72A
(Rev.8/82)

## I. BACKGROUND

### A. Procedural History

#### 1. The Underlying Suit

On June 23, 1995, Sam Nicholson, the lead plaintiff in a class action,[1] brought suit pursuant to the Telephone Consumer Protection Act ("the TCPA"), 47 U.S.C.A. § 227 (West 2001), in the Superior Court of Richmond County. (Doc. No. 1.)  In this suit, the plaintiffs alleged that Hooters of Augusta used co-defendant Value-Fax of Augusta ("Value-Fax") to send unsolicited facsimile ("fax") advertisements to fax machines in Georgia. (Id.)  On March 21, 2001, a jury verdict was returned against Hooters. (Id.)  Thereafter, on April 25, 2001, the trial judge entered judgment against Hooters in the amount of $11,889,000. (Id.)  After the judgment was entered, Hooters filed for Chapter 11 bankruptcy in the United States Bankruptcy Court for the Northern District of Georgia. (Id.)

Hooters subsequently appealed the verdict and judgment of the state court (Doc. No. 61 at 4); however, the appeal became moot on May 29, 2002 when, according to AGIC and Zurich, Hooters and Nicholson entered into a settlement agreement for $9,000,000. (Id. at 4-5.)  The $9,000,000 settlement amount is approximately $3,000,000 lower than the amount awarded

---

[1] I will use the singular "Nicholson" in this Order understanding that Nicholson actually represents a class of plaintiffs.

2

Nicholson's class on April 25, 2001. (Doc. No. 1 at 3.) The consideration for this reduction was Hooters' promise to do the following: (1) file a declaratory judgment action against AGIC and Zurich; (2) assign its claims against the insurance carriers to Nicholson upon request; and (3) discontinue the appeal of the state court judgment. (Doc. No. 62 at 6-7.) The Superior Court approved the settlement. (Id. at 7.)

Following the settlement between Hooters and Nicholson, one of the three interested insurance companies, New Hampshire Insurance Company ("New Hampshire"), settled with Nicholson for $1,000,000. (Id. at 8.) New Hampshire's settlement with Nicholson occurred before the conclusion of a declaratory judgment action involving New Hampshire. (Id.) According to AGIC and Zurich, New Hampshire's policy was the primary policy. (Id. at 9.)

### 2. The Present Case

Hooters filed the instant action (CV102-061) pursuant to the terms of the settlement between it and Nicholson, on February 20, 2002 against (1) Zurich, (2) AGIC, and (3) Nicholson. (Doc. No. 1.) The case was thereafter removed by Zurich and AGIC from the Superior Court of Richmond County on April 19, 2002 based upon the diversity of the parties' citizenship and the amount in controversy. 28 U.S.C.A. § 1332

3

(West 1993). In its Notice of Removal (Doc. No. 1), AGIC and Zurich argued that "the Court should look beyond the pleadings and arrange the parties according to their sides in this dispute, and in doing so realign Defendant Nicholson as a party plaintiff." (Doc. No. 1 at 2.) Zurich and AGIC further argued that "Nicholson is simply a sham defendant named for no other purpose than to attempt to defeat diversity. Plaintiff makes no claim for relief against Nicholson whatsoever." (Id. at 3.) After a hearing was held on June 18, 2002 on Plaintiff's motion for remand, the Court agreed with AGIC and Zurich and "realigned Nicholson as a plaintiff, maintaining jurisdiction over the case." (Doc. No. 62 at 7.)

On June 28, 2002, this case was statistically closed so that the parties could mediate the dispute. (Doc. No. 41.) The mediation failed, and the case was re-opened on September 26, 2002. (Doc. No. 43.)

The plaintiffs primarily seek "a declaration that under the liability policies issued by American Global and Zurich, [Hooters] was entitled to coverage for payment of the judgment which resulted from the settlement between Hooters and Nicholson." (Doc. No. 62 at 7.)

## B. The Insurance Policies

New Hampshire issued a commercial general liability

4

policy to Hooters[2] with effective dates of January 1, 1995 to January 1, 1996 and coverage limits of $1 million per occurrence and $2 million in the aggregate. (Doc. No. 62 at 8.)

AGIC issued an umbrella liability policy with the same effective dates as New Hampshire's policy and coverage limits of $5 million per occurrence, in excess of New Hampshire's primary coverage. (Id. at 9.) AGIC claims that it denied coverage after investigating Nicholson's claims. (Id.)

Zurich issued an excess liability policy to Hooters with coverage of $15 million in excess of the primary coverage and AGIC's umbrella policy. (Id.) Zurich claims it investigated Nicholson's claims, determined no coverage was afforded Hooters, and denied the claim on June 7, 2001. (Id.)

Nicholson has explained the operation of the relevant policies as follows: "[T]he policy provisions set forth in the Global [AGIC] policy . . . govern the determination of coverage with respect to the Zurich policy as it is 'form following.' The Omnibus Endorsement which replaces the insuring agreement in the Zurich policy provides, in part, that '[e]xcept for the terms, definitions, conditions and

---

[2] All of the insurance policies at issue in this case are issued in favor of Hooters of America, Inc., et al. Hooters of Augusta, Inc. is an additional named insured under endorsement to the policies or through reference to policies containing endorsements. There is no dispute between the parties that Hooters of Augusta, Inc. has standing in this litigation as an additional named insured.

exclusions of this policy, the coverage provided by this policy shall follow the insuring agreements, definitions, conditions and exclusions of the [AGIC] insurance policy . . . ." (Doc. No. 46 at 9 (citing Zurich Policy, Endorsement No. 5).) Thus, the parties have focused on the provisions in the AGIC policy. Further, in an appended schedule of underlying insurance, the AGIC policy refers to the New Hampshire policy by numerical reference (CPP3013761).

## II.    REQUIREMENTS FOR SUMMARY JUDGMENT

The Court should grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor . . . ." United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal quotation marks omitted).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the

6

motion.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

How to carry this burden depends on who bears the burden of

proof at trial.  Fitzpatrick v. City of Atlanta, 2 F.3d 1112,

1115 (11th Cir. 1993).   If the movant bears the burden of

proof at trial, that party "must show that, on all the

essential elements of its case, . . . no reasonable jury could

find for the nonmoving party."   Four Parcels, 941 F.2d at

1438.  On the other hand, if the non-movant has the burden of

proof at trial, the movant may carry the initial burden in one

of two ways--by negating an essential element of the non-

movant's case or by showing that there is no evidence to prove

a fact necessary to the non-movant's case.  See Clark v. Coats

& Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991)

(explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970)

and Celotex Corp. v. Catrett, 477 U.S. 317 (1986)).   Before

the Court can evaluate the non-movant's response in

opposition, it must first consider whether the movant has met

its initial burden of showing that there are no genuine issues

of material fact and that it is entitled to judgment as a

matter of law.  Jones v. City of Columbus, 120 F.3d 248, 254

(11th Cir. 1997) (per curiam).  A mere conclusory statement

that the non-movant cannot meet the burden at trial is

insufficient.  Clark, 929 F.2d at 608.

If--and only if--the movant carries its initial burden,

the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Id. Again, how to carry this burden depends on who bears the burden of proof at trial. If the movant has the burden of proof at trial, the non-movant may avoid summary judgment only by coming forward with evidence from which a reasonable jury could find in its favor. Anderson, 477 U.S. at 249. If the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Rather, the non-movant must respond by affidavits or as

8

otherwise provided by Federal Rule of Civil Procedure 56.

The clerk has given the parties notice (Doc. Nos. 49, 55, 59) of the summary judgment motions and the summary judgment rules, of the right to file affidavits or other materials in opposition, and of the consequences of default.   Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), are satisfied.   The time for filing materials in opposition has expired, and the motions are ready for consideration.

### III. **ANALYSIS**

The core question in this case is whether the jury award in the underlying litigation was covered by Zurich and AGIC's insurance policies.   See Hyman v. Nationwide Mut. Fire Ins. Co., 304 F.3d 1179, 1186-87 (11th Cir. 2002).   For the award to be covered, the injury caused by Hooters' violation of the TCPA must constitute either an advertising injury or property damage within the meaning of the relevant policies.[3]   If the injury does not fall within one of these two categories, the harm is not covered by the policies and the insurance

---

[3] The CGL Policy at issue in this case covers "those sums in excess of the Retained Limit that the Insured becomes legally obligated to pay by reason of liability . . . because of Bodily Injury, Property Damage, Personal Injury or Advertising Injury that takes place during the Policy Period and is caused by an Occurrence . . . ."   (AGIC Policy § I.)   The only two types of harm at issue in this case are property damage and advertising injury.

companies are not liable for payment.  If the policy provides
coverage, I must examine whether coverage is nullified for any
of the reasons cited by the Insurers.

## A. Coverage Provisions

I   must   first   consider   whether   the   injury   in   the
underlying case was an "advertising injury" within the meaning
of the policy.  The definition of "advertising injury", in
pertinent part,[4] is as follows: **"Advertising Injury** means
injury arising solely out of your [the insured's] advertising
activities as a result of . . . [o]ral or written publication
of material that violates a person's right of privacy . . . ."
(AGIC Policy § IV.A  (emphasis added).)[5]

The Eleventh Circuit has set forth a three-part test for
determining   whether   a   particular   violation   constitutes   an

---

[4] The parties appear to agree that if Nicholson's injury is covered
by the advertising-injury provision, it is because Hooters' advertising
violated his right of privacy.

[5] The advertising-injury provision in AGIC's CGL policy is standard
in the insurance industry.  See Hyman v. Nationwide Mut. Fire Ins. Co.,
304 F.3d 1179, 1187 (11th Cir. 2002) (stating that the CGL policy
containing an identical advertising-injury provision was standard in the
insurance industry); Frog, Switch & Manuf. Co. v. Travelers Ins. Co., 193
F.3d 742, 746 (3d Cir. 1999) (describing the same four categories of
advertising injuries, including the invasion-of-privacy provision, as the
instant case and stating that the language is "standard language for
defining advertising injury in commercial general liability policies");
Novell, Inc. v. Fed. Ins. Co., 141 F.3d 983, 987 (10th Cir. 1998)
(examining an insurance policy with a similar definition of "advertising
injury" as that in the instant case and explaining that the definition was
created by the Insurance Services Office, which publishes many standard
forms for the property-and-casualty insurance industry).

10

advertising injury.  See Hyman, 304 F.3d at 1187; Elan Pharm. Research Corp. v. Employers Ins. of Wausau, 144 F.3d 1372, 1375 (11th Cir. 1998).  First, I must decide whether the TCPA violation in the underlying case may constitute an "advertising injury" within the meaning of the insurance policy.  Hyman, 304 F.3d at 1187; id. at 1187 n.1.  If so, then the second question is whether Hooters engaged in advertising activity followed by the third question of whether there is a "causal connection" between that advertising activity and the resulting injury.  Id. at 1187.  Because the parties appear to agree that the faxes were advertisements, (see, e.g., Doc. No. 62 at 5-6 (reproducing the jury verdict form that referred to the fax disseminations as "advertisements"), I focus my discussion on whether (1) a violation of the TCPA may constitute an advertising injury and (2) whether there is a causal connection between the violation and the harm Nicholson suffered.

> 1.   Whether a TCPA Violation May Constitute an Advertising Injury

In answering the first question of whether a TCPA violation may constitute an advertising injury, the Hyman decision provides some guidance.  First, I must examine the language of the policy and define the terms of the relevant coverage provision.  Hyman, 304 F.3d at 1188-89 (beginning its

analysis of the advertising-injury provision of a CGL policy by defining "advertising idea" and "style of doing business"). In this case, the relevant terminology is "right of privacy". After defining the relevant term, I must then determine whether a violation of the TCPA may constitute a violation of a person's "right of privacy". Id. at 1189 (analyzing whether trade-dress infringement may be misappropriation of an "advertising idea" or "style of doing business"). If a TCPA violation falls within the coverage of the policy, I must finally decide whether the particular circumstances of the violation in the underlying case are covered under the policy. Id. at 1191 (finding that the circumstances of the particular trade-dress infringement gave rise to an advertising injury under the CGL policy).

### a.    The Definition of "Right of Privacy"

The phrase "right of privacy" is not defined in the policy. Under Georgia law, therefore, the Court looks to "what a reasonable person in the position of the insured would understand [the insurance terms] to mean." Cont'l Ins. Co. v. Am. Motorist Ins. Co., 247 Ga. App. 331, 334-35 (2000). "The policy should be read as a layman would read it and not as it might be analyzed by an insurance expert or an attorney." Id.

12

AO 72A
(Rev.8/82)

at 335 (internal quotation marks omitted).[6]

In common parlance, "privacy" is understood to mean "freedom from unauthorized intrusion." Webster's New Collegiate Dictionary 908 (1979); cf. Hyman, 304 F.3d at 1188 (citing case law quoting the dictionary). Thus, the phrase "right of privacy" is simply the "right to be let alone." Black's Law Dictionary 1075 (5th ed. 1979); see also Pavesich v. New England Life Ins. Co., 122 Ga. 190, 197 (1905) (equating, with quoted material, the right of privacy with the right "to be let alone"); Dennis v. Adcock, 138 Ga. App. 425, 429 (1976) ("[T]he right to privacy [] is basically the right to be let alone . . . ."). With the relevant phrase defined, I examine whether an infraction of the TCPA may violate a person's right of privacy.

> b.   Whether a TCPA Infraction May Violate a
>      Person's Right of Privacy

The TCPA makes it "unlawful for any person within the

---

[6] The Insurers contend that the "right of privacy" phraseology of the CGL policy refers to the torts that constitute an "invasion of privacy." (Doc. No. 62 at 39-46.) This approach is directly contrary to the Georgia courts' admonishment that an insurance policy "be read as a layman would read it and not as it might be analyzed by . . . an attorney." Cont'l Ins. Co. v. Am. Motorist Ins. Co., 247 Ga. App. 331, 335 (2000) (internal quotation marks omitted). Nothing in the policy constricts the relevant coverage provision to the common law torts for invasion of privacy. See Hyman v. Nationwide Mut. Fire Ins. Co., 304 F.3d 1179, 1189 (11th Cir. 2002) ("We are unconvinced by Nationwide's argument that 'misappropriation' covers only injuries actionable under the common law tort of 'misappropriation.' There is no indication in the policy that the phrase was intended to be so limited, and the ordinary meaning of the term misappropriation encompasses a wider spectrum of harms.").

AO 72A
(Rev.8/82)

United States . . . to use any telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine . . . ." 47 U.S.C.A. § 227(b)(1). As defined in the statute, an "unsolicited advertisement" means "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission." Id. § 227(a)(4).

The United States Court of Appeals for the Eighth Circuit has stated that "individuals at work in private businesses are entitled to expect that they will not be disturbed except by personal or business invitees . . . ." Van Bergen v. Minnesota, 59 F.3d 1541, 1554 (8th Cir 1995). The Eighth Circuit's premise comports with the layman's expectation that he will be "left alone" by marketers while he is pursuing his livelihood. To that effect, the TCPA provides that no one is to be harassed with advertisement faxes unless he specifically solicits them. 47 U.S.C.A. § 227(b)(1); see S. Rep. No. 102-178, at 8 (1991), reprinted in 1991 U.S.C.C.A.N. 1968, 1975, 1991 WL 211220 ("[T]he recipient [of a fax advertisement] either must invite or must give his or her permission to receive an advertisement via a fax machine."). Implicit in this statutory provision is the expectation that those who do not request fax advertisements will not be bothered by them.

14

While there is a paucity of decisional law on the TCPA, one court has specifically analyzed whether the receipt of advertisements at a business location violates a person's "right of privacy". See Merchants & Business Men's Mut. Ins. Co. v. A.P.O. Health Co. (Sup. Ct. Nassau County, N.Y. Aug. 29, 2002) (Westlaw, New York Law Journal Database). The Merchants court, citing the legislative history of the TCPA, determined that "receipt of unsolicited facsimile transmissions qualifies as a violation of the right of privacy, thereby triggering the coverage provisions of the subject policies." Id. As the Merchants court explained, the TCPA "was enacted precisely because unchecked telemarketing was regarded [as] an unacceptable invasion of the right of privacy. Indeed, the Act's legislative history repeatedly characterizes telemarketing excesses-which include unsolicited facsimile transmissions-as invasions of privacy." Id. (citations omitted); see also Minnesota ex rel. Hatch v. Sunbelt Communications & Marketing, LLC, No. CIV.02CV770 (JEL/JGL), 2002 WL 31017503, at *6 (D. Minn. Sept. 4, 2002) ("[T]he Court is convinced that the TCPA materially furthers the State's interests in preventing the invasion of privacy . . . that result[s] from fax advertising . . . ."). The Merchants court was careful to explain that it was analyzing the insurance policy "[a]pplying the test of common speech and

15

focusing on the reasonable expectations of the insured . . . ." See Merchants & Business Men's Mut. Ins. Co. v. A.P.O. Health Co. (Sup. Ct. Nassau County, N.Y. Aug. 29, 2002) (Westlaw, New York Law Journal Database); Prime TV, LLC v. Travelers Ins. Co., 223 F. Supp. 2d 744 (M.D.N.C. 2002) ("[T]he act of faxing DirectTV advertisements to the recipients is covered under the 'advertising injury' liability section in the Travelers [CGL] policies.").

Similarly, a layman understands his right to be left alone to include being left alone at work by advertisers sending unsolicited faxes. As such, I find that a TCPA violation may constitute an invasion of privacy within the meaning of AGIC's policy.

        c.    Whether the Circumstances of the TCPA
             Infraction Violated Nicholson's Right to
             Privacy

The circumstances of the TCPA violation in the underlying case establish that Nicholson suffered an invasion of privacy. First, the fax advertisement is specifically addressed to Sam Nicholson.[7]  (Doc. No. 62 at Ex. A.)  Second, the trial

---

[7] The Insurers argue that "[b]y the plain terms of the policy, there is no 'advertising injury' coverage whatever invasion of privacy Nicholson contends was suffered as a result of the fax to his business because the invasion (if it occurred) was to an 'organization' and not to a 'person'". (Doc. No. 62 at 46.)  First, the fax advertisement the Insurers provided to this Court specifically had the following in the top margin: "To: Sam Nicholson".  (Id. at Ex. A.)  Second, the fax number to which the fax was sent might have been a business number, but these faxes were intended for individuals; indeed, the advertisements would be worthless if people did

16

transcript demonstrates that the faxes were sent to Nicholson at his business fax number:

> Q.  Value-Fax faxes to business fax numbers, correct?
> A.  Yes, sir.
>
> . . .
>
> Q.  Now, when you acquired Value-Fax, am I correct that you acquired a database?
> A.  Yes, sir.
>
> . . .
>
> Q.  Was Mr. Nicholson's fax number on that database?
> A.  Yes, sir, it was?
> Q.  And that would be Mr. Nicholson's business fax, correct?
> A.  Yes, sir.
>
> . . .
>
> Q.  Therefore, it is your understanding that Mr. Nicholson was receiving faxes from Value-Fax prior to your acquisition of Value-Fax?
> A.  That's correct.

(Doc. No. 62 at Ex. B, pp. 153-54.)    The jury in the underlying case found that unsolicited faxes were sent to various individuals at their workplaces.    As a result, the circumstances of this case fall within the ambit of the policy.

---

not receive them.  Third, the term "person" in the policy is ambiguous. In Georgia, for instance, the term "person" includes a corporation.  <u>See</u> O.C.G.A. § 1-3-3(14) (Supp. 2000); <u>World Trade Business, Inc. v. Amit, Inc.</u>, 239 Ga. App. 383, 385 (1999).  Thus, the Insurers' argument is not persuasive.

AO 72A
(Rev.8/82)

2.   <u>Whether Hooters Advertising Activity and the Harm
to Nicholson are Causally Connected</u>

Having determined that a TCPA violation may constitute an "invasion of privacy" within the meaning of the insurance policy, I must now determine whether Hooters' advertising activity is causally connected to Nicholson's advertising injury. The requirement that the Court find a causal connection stems from the policy's declaration that an "Advertising Injury" is an "injury arising solely out of [the Insured's] advertising activities . . . . " <u>See</u> AGIC Policy § IV.A; <u>Hyman v. Nationwide Mut. Fire Ins. Co.</u>, 304 F.3d 1179, 1191 (11th Cir. 2002). To have a causal connection, "the injury for which coverage is sought must be caused by the advertising itself." <u>Hyman</u>, 304 F.3d at 1191 (quoting <u>Microtec Research, Inc. v. Nationwide Mut. Ins. Co.</u>, 40 F.3d 968, 971 (9th Cir. 1994)) (internal quotation marks omitted).

The advertising injury in the underlying case was caused by Hooters advertising activity. When Nicholson received the fax, his right of privacy was invaded, and the injury was complete. Thus, a nexus is established between the advertising and the harm.

3.   <u>Result</u>

Because Nicholson had a reasonable expectation that he would not be bothered by unsolicited junk faxes, the insurance

18

policy provides coverage as an "advertising injury" for the harm he suffered.  Despite this finding, AGIC and Zurich contend that the coverage should be nullified.  I now examine their contentions.[8]

## B. Nullification of Coverage

The Insurers maintain that to the extent coverage is found, it should be nullified for several reasons.  First, they contend (1) that § 227 is a penal statute, which the policy does not cover; (2) that § 227 imposes a penalty that the insured, not the insurer, should pay; and (3) that Endorsement No. 4 nullifies coverage for the advertising injury under the circumstances of this case.  If any of the Insurers' arguments succeed, the Insurers are not liable for damages.

### 1.    Whether Section 227 is a Penal Statute

AGIC and Zurich maintain that § 227 is a penal statute (Doc. No. 62 at 46-48) and, thus, coverage is not afforded for an insured's violation of it.  Under § 227, a plaintiff may elect to either prove actual monetary loss or receive $500 in statutory damages for each violation of the TCPA.  47 U.S.C.A.

---

[8] While Nicholson temporarily lost the use of his fax machine and permanently lost some ink and paper because of the unsolicited faxes, I need not make an analysis of the plaintiffs' property-damage claim because Hooters had coverage under the advertising-injury provision.

19

§ 227(b)(3)(B). If a court finds that the defendant willfully or knowingly violated the TCPA, it may increase the amount of the award to an amount equal to not more than three times the amount awarded as actual or statutory damages. Id. § 227(b)(3).

Nicholson filed suit in the underlying action seeking statutory (as opposed to actual) damages. On April 25, 2001, the trial judge entered judgment against Hooters in the amount of $11,889,000. Because the court determined that the violations of the TCPA were willful, the damages were trebled.

Exclusion K of the policy states that no coverage is provided for an "Advertising Injury . . . Arising out of the willful violation of a penal statute or ordinance committed by or with the consent of the Insured . . . ." (AGIC Policy § V.K). Because the jury in the underlying case specifically found that Hooters had willfully violated § 227, AGIC and Zurich contend that Exclusion K prevents coverage.

"A remedial action is one that compensates an individual for specific harm suffered, while a penal action imposes damages upon the defendant for a general wrong to the public." United States v. NEC Corp., 11 F.3d 136, 137 (11th Cir. 1993). The Eleventh Circuit has set forth a three-part test for determining whether a statute is penal or remedial. A court must ask (1) whether the purpose of the statute is to redress

20

individual wrongs, or more general wrongs to the public; (2) whether recovery under the statute issues to the harmed individual or to the public; and (3) whether the recovery authorized by the statute is wholly disproportionate to the harm suffered.  Id.

The first factor indicates that § 227 is a remedial statute.  Several courts have indicated that one of the purposes of the statute is to redress harms to individuals who are forced to absorb the costs associated with receiving unsolicited faxes.  See Destination Ventures Ltd. v. FCC, 844 F. Supp. 632, 637 (D. Or. 1994) (indicating that Congress was intent on protecting fax machine owners from the economic harm caused by unsolicited faxes); Kenro, Inc. v. Fax Daily, Inc., 962 F. Supp. 1162, 1167 (S.D. Ind. 1997) (citing Destination Ventures and noting that § 227 was intended to prevent advertisers from unfairly shifting advertising costs to the individual consumer who receives faxes).  Indeed, a congressional Report notes that lawmakers were seeking to protect those people whose fax machines were being unfairly utilized by advertisers. H.R. Rep. No. 102-317, at 10 (1991), 1991 WL 245201.[9]  Thus, § 227 was intended to provide a remedy

---

[9] The text of the report provides as follows:

Facsimile machines are designed to accept, process, and print all messages which arrive over their dedicated lines. The fax advertiser takes advantage of this basic design by sending advertisements to available fax numbers, knowing that it will

to the individual fax machine owner who is harmed by the receipt of unsolicited fax advertisements.

The second factor also indicates that § 227 is remedial. Section 227 provides that any award of actual or statutory damages issues to the harmed individual or entity, not to a third party.  47 U.S.C.A. § 227(b)(3).  Further, any award of treble damages goes to the harmed fax machine owner.

Finally, although the statutory damages do not closely correspond to actual damages, this fact does not convert a remedial statute into a penal one.  Decisional law binding on this court indicates that disproportionate statutory damages and even multiplied damages awards do not necessarily make a statute penal.  See In re Wood, 643 F.2d 188, 193 n.12 (5th Cir. 1980)[10] ("The fact that the statute allows for accumulated recovery does not convert an otherwise remedial statutory scheme into a penal one."); id. at 192 ("[The party] initially contends that section 130 is penal because it imposes liability beyond the amount of actual damages suffered by the debtor.  This argument . . . is [ ] rejected . . . .").  Even

be received and printed by the recipient's machine. This type of telemarketing is problematic for two reasons. First, it shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax.

[10] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions that were handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/82)

were the trebling portion of § 227 considered to be penal in nature, this one factor cannot transform § 227 into a penal statute.  To find otherwise would be to treat this one fact as dispositive thereby nullifying all the other indications that the statute is remedial.  See Citronelle-Mobile Gathering, Inc. v. O'Leary, 499 F. Supp. 871, 887 (S.D. Ala. 1980) (noting that one factor in the abstract weighed in favor of finding a particular statute penal, but nonetheless determining it to be remedial).

For the aforementioned reasons, I find that § 227 is a remedial statute and, thus, Exclusion K does not apply.

### 2.    Whether § 227 Imposes a Monetary Penalty

The Insurers contend that an award of $500 per violation is so excessive in relation to any actual damages that it is actually a penalty, which is not covered by the policy.[11] (Doc. No. 62 at 28.)  Distilled to its essence, the Insurers' argument is that the sums above the actual damages are punitive and, therefore, they should not be compelled to pay the insured's penalty. Georgia law, however, does not support their contention.

---

[11] "Damages" and "Penalties" are different concepts.  "The term damages refers to the loss suffered by an injured party expressed in a dollar amount." Travelers Ins. Co. v. Waltham Indus. Labs. Corp., 722 F. Supp. 814, 828 (D. Mass. 1988).  In contrast, "penalties are not designed to compensate an injured party, but are designed to deter conduct deemed undesirable by the legislature." Id.

I begin with the language of the policy, which states that the Insurers "will pay on behalf of the Insured those sums . . . that the Insured becomes legally obligated to pay by reason of liability imposed by law . . . because of . . . Advertising Injury that takes place during the Policy Period and is caused by an Occurrence happening anywhere in the world." (AGIC Policy § I (emphasis added).) First, the term "sum" is broad and is defined as "the whole amount." Webster's New Collegiate Dictionary 1157 (1979). Second, and significantly, no provision in the policy excludes the payment of punitive damages or penalty amounts, and I have already determined that the statute is remedial one.

The Georgia appellate court has held that it is not contrary to public policy for an insurer to pay a punitive award on behalf of an insured. See Lunceford v. Peachtree Cas. Ins. Co., 230 Ga. App. 4, 6 (1997) ("We simply cannot agree with Peachtree that liability insurance against punitive damages is forbidden in this state.") (citing Fed. Ins. Co. v. Nat'l Distrib. Co., 203 Ga. App. 763 (1992)); see also Greenwood Cemetery, Inc. v. Travelers Indem. Co., 238 Ga. 313, 316, 317 (1977) (per curiam) (stating, under an older version of the Georgia code, that "it has been held that it is not against public policy to insure against damages for wilful and wanton misconduct. . . . Punitive damages is a legal liability

24

and accordingly insurance against such damages is expressly authorized."). Rather, the procedure of the Georgia courts is to address the terms of the policy to determine if punitive damages are excluded. If punitive damages are not explicitly excluded, it is reasonable to conclude that the policy provides coverage. See Lunceford, 230 Ga. App. at 6 ("Examining this insurance policy and applying the rules concerning contract construction, we reiterate that the insurance policy does not clearly exclude punitive damages, and its coverage broadly addresses 'damages.' It is therefore reasonable to conclude on this ground that the policy provides coverage.") (emphasis added).

Applying Georgia law, the policy promises to pay "those sums" that an insured becomes legally obligated to pay. (AGIC Policy § I.) Because the Georgia Supreme Court has held that punitive damages are a legal liability and the policy does not exclude coverage for a punitive award or a penalty amount, the policy covers Nicholson's award in the instant case. Furthermore, when the Georgia courts have refused to find coverage for a punitive award, the insurance policy has had a specifically applicable exclusion. See Capitol Indemnity, Inc. v. Brown, No. A02A1982, 2003 WL 1563560, at *3 (Ga. Ct. App. Mar. 27, 2003) ("The policy also provides no coverage for his punitive damage claims, which are specifically excluded

from the Commercial General Liability Coverage Part.")
(emphasis added); <u>Southern v. Sphere-Drake Ins. Co.</u>, 226 Ga.
App. 450, 452 (1997) (stating that in a general liability
policy "the punitive damage exclusion endorsement specifically
foreclosed coverage for those damages"). As a result, and
regardless of whether Nicholson's award is construed as a
"penalty" or as "punitive damages", the sum was covered under
the insurance policies.

### 3.    Whether Endorsement No. 4 Excludes Coverage

The insurance policy states that the Insurer

> will pay on behalf of the Insured those sums in
> excess of the Retained Limit that the Insured
> becomes legally obligated to pay by reason of
> liability imposed by law . . . because of . . .
> Advertising Injury that takes place during the
> Policy Period and is caused by an Occurrence . . .
> .

(AGIC Policy § I.)  An "Advertising Injury" is thereafter
defined as an "injury arising solely out of [the Insured's]
advertising activities as a result of . . . Oral or written
publication of material that violates a person's right of
privacy."  (<u>Id.</u> § IV.A.)  However, Endorsement No. 4 sets
forth a broad exclusion providing that the "insurance does not
apply to . . . [1] <u>Advertising Injury</u> arising out of the
utterance or [2] <u>dissemination of matter</u> [3] <u>published by or
on behalf of the Insured."</u>  (<u>Id.</u> at Endorsement No. 4

26

(emphasis added).)

This broad Endorsement completely nullifies the coverage for any advertising injury. According to the coverage provisions, an (1) Insured who (2) publishes material that (3) violates a person's right of privacy may have the harm covered under the policy. Yet, the exclusionary Endorsement declares that an (1) advertising injury (2) arising out of the utterance or dissemination of matter (3) published (4) by or on behalf of the Insured is not covered. Read fairly, the Endorsement completely abrogates the coverage provided in the same document because every advertisement would be excluded by it.[12]

When an exclusion completely nullifies the coverage provided in a policy, that exclusion has no effect according to the Georgia Court of Appeals:

> [W]e have a situation where one provision of the

---

[12] The Insurers contend that the word "publication" in the coverage provision and the word "published" refer to two different situations. (Doc. No. 62 at 48-49.) They contend that the word "publication" refers to the release of material to the public while the word "published" in the exclusion refers to the "actual act of creating written material." (Id. at 49.) This distinction in definition, they contend, make the terms applicable to different circumstances. (Id.)

I am not persuaded by the Insurer's argument. Neither term is defined in the policy and no layman would know that the terms had such precise definitions. Indeed, the policy is ambiguous concerning what the words mean. It has long been Georgia law that "[i]n the case of ambiguity, the insurance contract must be construed against the drafter . . . ." Isdoll v. Scottsdale Ins. Co., 219 Ga. App. 516, 518 (1995) (emphasis added). As the Eleventh Circuit has stated (citing Isdoll), if "an insurance policy is confusing to a layman, the policy is ambiguous." York Ins. Co. v. Williams Seafood of Albany, Inc., 223 F.3d 1253, 1255 (11th Cir. 2000). At best the Insurers' contention means that the policy is ambiguous. Thus, there is no basis for excluding coverage based on the purportedly different definitions of "publication" and "published".

27

> policy excludes liability and another accepts
> liability. Every written provision of an insurance
> contract must be given its apparent meaning and
> effect.   The   provisions   currently   under
> consideration are repugnant to one another.   When
> that occurs in an insurance contract, the provision
> most favorable to the insured will be applied.

Isdoll v. Scottsdale Ins. Co., 219 Ga. App. 516, 518 (1995)

(internal quotation marks omitted).   Under the circumstances

of this case, the policy grants coverage under one provision

and then excludes it in another.   Pursuant to Georgia law, the

effective   provision,   therefore,   shall   be   the   coverage

provision since that provision is the most favorable to

Hooters.  See Isdoll, 219 Ga. App. at 518.

This result adheres to the principal in Georgia law that

insurers should not be allowed to provide illusory coverage.

That is, the Insurers must not deceive insurance purchasers

into believing they have coverage only to have an exclusionary

provision entirely nullify it.   See United States Fire Ins.

Co. v. Hilde, 172 Ga. App. 161 (1984).[13]

---

[13] Nicholson has argued in his brief that Endorsement No. 13 was
issued after the injuries in the underlying case had occurred and after
the complaint in the underlying case had been filed.  (Doc. No. 46 at 22.)
He admits that if this Endorsement had been in effect during the time the
injuries occurred, the policy would not have provided coverage under the
advertising injury provision.   (Id.)   However, Nicholson argues that
Endorsement No. 13, which is much more detailed than Endorsement No. 4,
sheds some light on what was excluded by Endorsement No. 4.    (Id.)
Nicholson contends that "[u]nder the doctrine of inclusio unius, exclusio
alterius, the subsequent exclusion of coverage for this activity [the
advertising activity] by [AGIC] necessarily implies its inclusion prior to
the effective date of Endorsement Number 13.   The exclusion would be
unnecessary unless this conduct was included and covered by the policy .
. . ." (Id. (emphasis in original).)   Because Endorsement No. 4 cannot
prevail based on Georgia law, I need not address the implications of the
later-added Endorsement No. 13.

AO 72A
(Rev.8/82)

4.    Result

For the aforementioned reasons, the coverage provided by the policy is not nullified for any reason.  This conclusion resolves the allegations in Count I and Count II of the complaint.

**C. The New Hampshire Settlement**

Having found that Nicholson's injury was covered by the applicable policies and that the coverage was not nullified for any reason, I now address the question of what effect Nicholson's settlement with New Hampshire has on AGIC's and Zurich's liability.    The Insurers contend that Nicholson settled with the primary insurer for less than the primary policy amount and, thus, that an issue arises about how much the excess insurers must pay.

1.    Facts of the New Hampshire Settlement and Arguments
       of the Insurers

The AGIC policy provides that the company will pay "those sums in excess of the Retained limit . . . ."  (AGIC Policy § I.)    The "Retained Limit" is defined, in relevant part, as "[t]he total of the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance and the applicable limits of any other underlying insurance providing coverage to the Insured."   (Id. § III.E.)

The Insurers assert that the underlying insurance provided by New Hampshire had a total limit of $1 million per occurrence with an aggregate of $2 million. (Doc. No. 62 at 50.) AGIC's policy offered $5,000,000 coverage per occurrence with an aggregate coverage limit in the same amount for liability beyond the primary insurance coverage provided by the New Hampshire policy. (Id. at Ex. H (Commercial Umbrella Declarations); id. at Ex. H (Schedule of Underlying Insurance).) Zurich's excess liability policy offered $15,000,000 for each occurrence with an aggregate total of $15,000,000. (Id. at Ex. I.) Zurich's policy identified AGIC's policy as providing underlying insurance for $5,000,000 coverage per occurrence and the same amount in aggregate, and provided that Zurich would "pay on behalf of the Insured the Ultimate Net Loss in excess of the Underlying Insurances . . . ." (Id.) Summarily stated, once the limits of coverage of the primary insurance were exhausted, AGIC would pay any excess liability to the limits of its coverage. Once AGIC's coverage was exhausted, Zurich would pay those sums still owing to the extent of the limits in its policy.

2.   Analysis

"[U]nder Georgia law in attempting to ascertain the intentions of the parties, insurance contracts are governed by

30

the ordinary rules of construction applicable to other contracts." <u>Garmany v. Mission Ins. Co.</u>, 785 F.2d 941, 945 (11th Cir. 1986) (citing <u>Golden v. Nat'l Life & Acc. Ins. Co.</u>, 189 Ga. 79, 87 (1939)). "Where the meaning [of the insurance contract] is plain and obvious, it should be treated as <u>literally</u> provided therein." <u>Genone v. Citizens Ins. Co. of N.J.</u>, 207 Ga. 83, 86 (1950) (emphasis added); <u>Garmany</u>, 785 F.2d at 945 (citing <u>Genone</u>).

The Eleventh Circuit has determined that when an umbrella policy clearly sets a threshold starting point for payment, the contract is unambiguous and must be enforced:

> The <u>umbrella policy</u> sets a threshold point of liability for loss "in excess of . . . the limits of the underlying insurances as set out in the attached schedule." That schedule sets the limits of the Fireman's Fund primary policy as $500,000. The provisions contain no alternative possibilities or contingencies, nor do they attempt to account for variances in coverage as to different situations encountered under the same underlying policy. <u>These two clauses, when read in tandem, unambiguously set a fixed point at which Mission's liability under the excess policy arises-$500,000.</u> We simply do not discern any ambiguity under this-the only reasonable construction of the umbrella policy.

<u>Garmany</u>, 785 F.2d at 946 (emphasis added).[14]

According to the example of the <u>Garmany</u> court, I begin with the provision of AGIC's policy that states the threshold

---

[14] "Both umbrella and excess liability insurance policies serve to augment primary comprehensive general liability insurance coverage." <u>Scottsdale Ins. Co. v. Safeco Ins. Co. of Am.</u>, 111 F. Supp. 2d 1273, 1277 (M.D. Ala. 2000).

31

point of liability.  That provision provides that the policy
covers those sums "in excess of the Retained Limit . . . ."
(AGIC Policy § 1.)  The definition of "Retained Limit" is the
"total of the applicable limits of the underlying policies
listed in the Schedule of Underlying Insurance and the
applicable limits of any other underlying insurance providing
coverage to the Insured . . . ."  (Id. § III.E (emphasis
added).)  AGIC's "Schedule of Underlying Insurance" then lists
New Hampshire as providing AGIC coverage for $1 million per
occurrence (Doc. No. 62 at Ex. H), which would be the limit of
the policy if there were only one occurrence.

According to the settlement reached between Nicholson and
New Hampshire, the parties "understood and agreed that the
consideration [of $1 million] paid . . . constitutes the
limits of liability coverage afforded under [the] New
Hampshire policy . . . ."  (Doc. No. 62 at Ex. G (emphasis
added).)  No one is better positioned to interpret an
insurance contract than a party to that contract, such as New
Hampshire in its settlement with Nicholson.  New Hampshire's
and Nicholson's conclusion that there was one occurrence is
not strained or unreasonable, and they are free to come to
mutual agreement about the coverage of the policy.[15]  I decline

---

[15] Nicholson stated that "American Global and New Hampshire Insurance
Company are both affiliated with the same parent company, American
International Group."  (Doc. No. 68 at 15 (citing New Hampshire Policy
Declaration (attached as Ex. A to Nicholson's brief)).  During the hearing

to search the reasons for the parties' conclusion that there was one occurrence. As a result, the primary insurance policy afforded coverage of only $1 million dollars, which was paid by New Hampshire thereby exhausting the primary policy.

AGIC's policy sets forth the threshold of liability in almost precisely the same way as the policy in Garmany. The policy states that AGIC will begin payment when the primary insurance is exhausted, whether it be at $1 million for one occurrence or $2 million in aggregate. Because AGIC's contract is clear that it will provide coverage once the primary insurance is exhausted, and the primary insurance was exhausted at $1 million, AGIC must pay, to the extent of its coverage, those sums in excess of $1 million.[16]   Upon the

---

of January 7, 2003, counsel for the insurers argued that there was no evidence before the Court that AGIC and New Hampshire were related. Nicholson's exhibit, of course, indicates the contrary. I know of no more important part of any insurance policy than the Declarations Page. This basic document proclaims that it is a "Common Policy Declaration" used by New Hampshire Insurance Company and American Global Insurance Company, among others, who are "Member Companies of The American International Group, Inc." The implication is that the listed companies have but to insert their designated number in the box supplied so the parties will know which of the affiliates provides the stated coverage on the common form used by all. Nicholson's statement that New Hampshire and AGIC are "both affiliated" is hardly hyperbolic. The proclamation of the "Common Policy Declaration" strongly supports Nicholson's assertion. While there may be an insufficient evidentiary record upon which to base a conclusion that AGIC is estopped to contradict the terms of the Nicholson-New Hampshire settlement, the insurers' argument that there is no evidence of a relationship between the companies is, at best, disingenuous.

[16] The Insurers have requested further argument on the issue of whether the primary policy was exhausted. (Doc. No. 62 at 52.) However, the settlement agreement operates to bind Nicholson to his assertion that there was one occurrence and this conclusion is reasonable. Thus, further argument will be of little help because I decline to determine, in direct contradiction of the settlement agreement, that there was more than one occurrence.

exhaustion of the coverage limit afforded by AGIC which is set at the sum of $5,000,000.00, Zurich's policy will afford further coverage.

## IV. **ATTORNEY'S FEES**

The insurers' motion for summary judgment is all-inclusive because it contends that the plaintiffs' claims cannot succeed. As such, I will address the request for attorney's fees in Count III of the complaint, though Hooters has provided no discussion of the issue in its brief.

Count III asserts that AGIC and Zurich should pay Hooters' attorney's fees pursuant to O.C.G.A. § 13-6-11. Georgia law allows a plaintiff to recover attorney's fees where "the defendant [1] has acted in bad faith, [2] has been stubbornly litigious, or [3] has caused the plaintiff unnecessary trouble and expense . . . ." O.C.G.A. § 13-6-11 (Supp. 2002). After a review of the evidence in this case, I conclude that Hooters cannot meet this standard.

The Georgia appellate court has held that "[a]n attorney fee award based upon unnecessary trouble and expense cannot be upheld on a breach of contract claim if the evidence showed that a bona fide controversy existed between the parties." Freightliner Chattanooga, LLC v. Whitmire, No. A03A0689, 2003 WL 21518130, at *5 (Ga. Ct. App. July 7, 2003). At the time

34

Hooters filed suit, no Georgia case addressed the issues presented in this matter. The novelty of this dispute precludes finding that the insurers either put Hooters and Nicholson to unnecessary trouble and expense or were stubbornly litigious. Furthermore, to establish bad faith, the plaintiffs must demonstrate that the defendants refusal to pay "is not prompted by an honest mistake as to one's rights or duties but [rather] by some interested or sinister motive." Id. The record is devoid of any evidence that would authorize an award of attorney's fees in this circumstance. As a result, Plaintiffs may not collect attorney's fees pursuant to O.C.G.A. § 13-6-11.

## V. CONCLUSION

For the aforementioned reasons, AGIC's and Zurich's policies provide coverage for the harm suffered by Nicholson. The insurance policies afford coverage because Nicholson suffered an advertising injury. Coverage is not nullified for any reason. As a result, it is **ORDERED AND ADJUDGED** that Nicholson's motion (Doc. No. 44) and Hooters' motion (Doc. No. 54) for summary judgment are **GRANTED** in regard to the coverage of the insurance policies. Further, AGIC's and Zurich's joint motion for summary judgment is **DENIED** in regard to the coverage of the insurance policies. (Doc. No. 58.) With

35

respect to the relief sought in Count I of the complaint, the **CLERK** is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Plaintiffs on the issues of liability presented herein. Costs are taxed against Defendants.

For the purpose of affording relief under Count II of the complaint, it is **ORDERED** that counsel for the parties shall confer and submit to the Court for consideration a final monetary judgment in favor of plaintiffs within **10 days** of the entry of this order granting summary judgment. The parties may confer and make a joint proposal with respect to the form of the judgment without concern for any waiver or abandonment of any position previously taken in this litigation.

It is **FURTHER ORDERED AND ADJUDGED** that Nicholson's motion (Doc. No. 44) and Hooters' motion (Doc. No. 54) for summary judgment are **DENIED** in regard to any request for attorney's fees. AGIC'S and Zurich's joint motion for summary judgment is **GRANTED** in regard to any request for attorney's fees. (Doc. No. 58.) With respect to the relief sought in Count III of the complaint, the **CLERK** is **DIRECTED** to enter **FINAL JUDGMENT** in favor of Defendants on the issue of the payment of the plaintiffs' attorney's fees.

After the entry of a final monetary judgment in proper form and the assessment of costs to be taxed against the defendants, the **CLERK OF COURT** shall **CLOSE** this case.

36

**ORDER ENTERED** at Augusta, Georgia, this ___23ʳᵈ___ day of July 2003.

CHIEF UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)

UNITED STATES DISTRICT COURT
Southern District of Georgia

Case Number:     1:02-cv-00061
Date Served:     July 23, 2003
Served By:       Joseph A. Howell

Attorneys Served:

    Ziva P. Bruckner, Esq.
    David Michael Brown, Esq.
    John C. Bonnie, Esq.
    Paul L. Weisbecker, Esq.
    Arthur H. Glaser, Esq.
    Mark B. Bullman, Esq.
    H. Wilson Haynes Jr., Esq.
    Harry D. Revell, Esq.

    Copy placed in Minutes
    Copy given to Judge
    Copy given to Magistrate